UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| DAVID ANTHONY WHEETLEY,<br> # 251206, | ) ) ) | |
| Petitioner, | ) ) | Case No. 1:08-cv-400 |
| v. | ) ) | Honorable Robert J. Jonker |
| SHIRLEE HARRY, | ) ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254.  Petitioner's convictions stem from the March 5, 2000 killing of Paul Afton.  "Afton was
shot and killed sometime after leaving a bar in the early morning hours of March 5, 2000.  At trial,
five witnesses testified that [petitioner] made several incriminating statements to them, including an
account of how he and two others robbed and killed Afton.  Further, Detective Richard Miller of the
Michigan State Police testified that [petitioner] had knowledge about the condition of the victim's
pants that was not released to the general public.  Additional evidence adduced at trial included tire
tread patterns found at the murder scene that matched two of the tires from [petitioner's] car,
testimony that [petitioner] had been seen with a .25 caliber handgun before the shooting and that .25
caliber bullet casings and slug were found at the scene, and DNA evidence linking [petitioner] to a
cigarette butt found at the scene."  *People v. Wheetley*, No. 249237 (Mich. Ct. App. Oct. 28, 2004)
(*per curiam*).  On December 20, 2002, a Newaygo County Circuit Court jury found petitioner guilty

of first-degree felony murder,[1] M‌ICH. C‌OMP. L‌AWS § 750.316(1)(b), and possession of a firearm

during the commission of a felony, M‌ICH. C‌OMP. L‌AWS §750.227b.  On January 28, 2003, petitioner

was sentenced to life imprisonment on the first-degree felony murder conviction and a consecutive

two-year sentence on the felony firearm conviction.  After unsuccessful efforts to overturn his

conviction in the Michigan courts, petitioner brought this habeas corpus proceeding.

Petitioner claims entitlement to federal habeas corpus relief on the following grounds:

I.    Petitioner was denied his constitutional right to a fair trial where he was convicted in part, based on unfairly prejudicial character evidence and unsubstantiated hearsay.

    A.    Petitioner was denied his right to a fair trial by the use of unfairly prejudicial evidence, namely that a witness had seen him with a grenade some months after the homicide here.

    B.    Petitioner's right to a fair trial was impaired by vague references to bad character delivered by a police officer, the former officer in charge of the case.

    C.    The trial court reversibly erred by admitting inadmissible hearsay.

II.   Petitioner was denied his due process right to a fair trial by the prosecutor's misconduct where the prosecutor mislead the jury about the record testimony to connect Mr. Wheetley to the type of gun used in the homicide and where the prosecutor took advantage of the pro per petitioner to portray him as a violent individual.

III.  Petitioner was denied his constitutional rights to present a defense and to cross-examine witnesses.

IV.   Petitioner was denied due process of law and a fair trial when the prosecutor failed to present sufficient evidence of "felony murder" to convince a rational trier of fact of petitioner's guilt on each essential element of the charged offense "beyond a reasonable doubt."

---

[1]The jury also found petitioner guilty of aiding and abetting in an armed robbery, but this conviction was vacated at sentencing because it was the predicate offense for petitioner's first-degree felony murder conviction.

V.    Petitioner was denied due process of law when the prosecutor violated the court's discovery order and failed to give "full disclosure of all police reports."

VI.   Petitioner's conviction must be reversed because the waiver of his right to counsel was constitutionally inadequate where he did not make an unequivocal request to represent himself, and petitioner was not advised of the pitfalls of self-representation.

VII.  Petitioner was denied equal protection and due process of law by the trial court's refusal to grant funds for an investigator.

VIII. Petitioner was denied due process of law and a fair trial when he was forced to appear before the jury in leg restraints.

IX.   Petitioner was denied the effective assistance of counsel when his appellate counsel failed to raise the issues petitioner later presented in his motion for post-conviction relief.

(Am. Petition, docket # 7, ¶ 14).  Respondent argues that all of the grounds raised by petitioner lack merit, and that grounds I, II, and VI-IX are barred by procedural defaults.  (docket # 12).  Upon review,  I recommend that the petition be denied for lack of merit in all grounds raised.

### Procedural History

**A.    Pretrial Proceedings**

Carlton Hobbs, Joseph Jones, and petitioner were charged with conspiracy to commit armed robbery, armed robbery, felony murder, and possession of a firearm during the commission of a felony.  On June 17 and 18, 2002, petitioner and the others received a preliminary examination in 78th Judicial District Court for the County of Newaygo.  Petitioner was represented by Attorneys David Jaunese and John MacAyeal.  (docket # 15, Preliminary Examination (PE) at 5).  An initial matter addressed by the district court was petitioner's desire to represent himself:

THE COURT:  Okay, okay.  While we're waiting, I wanted to mention again, I've done this once before to Mr. Wheetley, Mr. Wheetley, you do understand that you have counsel here to assist you, okay?

-3-

DEFENDANT WHEETLEY:  Yes, Your Honor.

THE COURT:  Okay.  And but you've indicated to the court that you wish to represent yourself, is that right?

DEFENDANT WHEETLEY:  Yes, I wish to go propria persona.

THE COURT:  Okay.  And -- and the Court is advising you, you do have a right to represent yourself but I've encouraged you to -- to listen to your lawyers and but the Court would note for the record they are here to assist you if you need them.

DEFENDANT WHEETLEY:  Thank you, Your Honor.

(PE, 11).  Petitioner was an active participant in the cross-examination of preliminary examination witnesses.  (PE, 20-21, 25, 33-34, 57-58, 79-80, 103-04, 127, 151-52, 160, 174-75).  On June 18, 2002, Judge H. Kevin Drake bound over petitioner for trial on all charges.  (PE, 211, docket # 16).

On July 2, 2002, petitioner was arraigned in Newaygo County Circuit Court. (Transcript (TR), docket # 17).  Attorney Jaunese was present to assist petitioner.  Judge Terrence R. Thomas engaged petitioner in the lengthy process of pointing out potential pitfalls of exercising his right to self-representation.  (TR, 3-9).  Judge Thomas emphasized to petitioner that representing himself was "not a wise thing to do" and that he would be held to the same rules of evidence and procedure as a lawyer.  (TR, 3-4).  Judge Thomas inquired as to petitioner's age and educational background.  Petitioner responded that he was twenty-five years old.  He went to prison at age eighteen for possession of narcotics.  He obtained his G.E.D. while incarcerated at a prison facility located in Michigan's Upper Peninsula.  Petitioner had taken some college-level courses through Baker College and he worked as a law clerk in Jackson Prison.  (TR, 5-6).  Judge Thomas asked petitioner why he was choosing self-representation over representation by counsel:

THE COURT:  What's leading you to this conclusion?

-4-

THE DEFENDANT:  Just the fact that I feel like I can, that I can do better cross-examinations because I know everything about the case.  I can study it a lot more than per se Mr. Jaunese because he has other cases to do, and you know, and I -- I just feel I can do a lot better job representing myself in a case like this.

(TR, 4).  Petitioner understood that he faced a potential sentence of life without parole if convicted:

THE COURT:  Well, I'm going to maintain that Mr. Jaunese stay as your lawyer.  If you choose not to use him that's your business, but if you're convicted, and these are very serious, serious charges you could end up with potentially life in prison without parole.  You know what I mean?

THE DEFENDANT:  Believe me I know.  Every day that's all I think about.  I understand that very clearly, Your Honor, but I would still like to represent myself.

* * *

THE COURT: But I'll keep Mr. Jaunese appointed as your Counsel.  Now how you choose to use him, he obviously can't do anything without -- he can't effectively represent you without your cooperation.  But if you want to use him as a --
        But the point is, is if you're convicted I don't want it on my conscience if you spend the rest of your life in prison because you were --

THE DEFENDANT:  The only way I look at it that way if I represent myself I can't be mad at him for the rest of my life if I get found guilty.  I'll be mad at myself.

THE COURT:  Well, the point is that these lawyers don't have anything to do with these cases.  There's no reason to be mad at anybody.

THE DEFENDANT:  Well, you know what I mean.  You know how everybody says that.  I'd just like to -- I'd like to do all the cross-examining.  I'd like to plan the defense strategy, certain things like that.  If Mr. Jaunese you know wants to help, if I have any questions I can write him.

(TR, 7-8).

On August 13, 2002, the court conducted a hearing on various pretrial motions.

Petitioner continued to insist on self-representation:

THE COURT:  David, you requested to represent yourself.  I've granted that request, even though it's against my best judgment.  And I've also assigned Mr. MacAyeal to assist you throughout this matter.

(docket # 18 at 3).

On October 28, 2002, petitioner filed a motion requesting that the court appoint a private investigator.  ("Motion for Investigative Services," found in Michigan Supreme Court Record, docket # 30).  Petitioner's motion did not identify any individual he needed to have interviewed.  He simply asserted that an investigator was "needed to interview both defense and prosecution witnesses." (*Id.*).  On November 25, 2002, the court conducted a hearing on petitioner's motion.  (Hearing Transcript (HT), docket # 19).  The court noted that petitioner already had appointed counsel and that his attorney was capable of interviewing potential witnesses. (HT, 7-8).  Petitioner did not provide the court with any specific information regarding the identity of any individual he wanted an investigator to interview:

> THE COURT:  Well, you got a whole list of their witnesses.  I'm not going to authorize a blanket.  You tell me.  But I'm not going to deny your motion.  But you have to give me some specifications and some parameters, but just to employ an investigator, no.

> THE DEFENDANT:  We can have a side bar, I'll write you a note.  I don't want to give away my defense.  I'll give away too much of my trial strategy if I tell you --

> THE COURT:  Well, this is a matter of public record.  When you're making these applications it's a matter of public record.  You're asking the government, the people out here to pay for it, and they have a right to know what you're asking for and the parameters of it.

> THE DEFENDANT:  I'm representing myself, so I'm an indigent person.

> THE COURT:  But you are held to the same standards as everybody else, and the court is obligated to give you some leeway, but you got to perform by the law just like you're represented by a lawyer.  And not only that, I've given you the advice of a lawyer who is on standby, so --

> Now what else do you want?

> So I'm not denying your motion, but I'm not granting it until I've got some specifics.

(HT, 10-11).

The November 25, 2002 hearing transcript further reinforces the fact that petitioner knew the maximum penalty he faced if convicted:  "I've got three weeks until trial your Honor, and I'm representing myself on a life case."  (HT, 17).  The court encouraged petitioner to take advantage of the assistance of his appointed counsel.  (HT, 20).  Judge Thomas reiterated that if Attorney John Beason filed an appearance,[2] the court would be willing to entertain a motion for an adjournment of petitioner's trial "to accommodate [petitioner] being represented by Mr. Beason if that's what [petitioner] desire[d]."  (HT, 22).

On December 9, 2002, the court conducted a final hearing before petitioner's trial began.  Once again, petitioner insisted on going forward and representing himself:

THE COURT:  David, you know your trial starts on Monday?

THE DEFENDANT:  Yes, sir.

THE COURT:  You know you're entitled to be represented by a lawyer.  You've maintained that you want to represent yourself.  And I've kept Mr. Prysock, at least he's available to you, if you change your mind relative to representation.

THE DEFENDANT: No, I'm going to represent myself.

THE COURT:  Can't talk you into letting a lawyer represent you?

THE DEFENDANT:  Well, your Honor, as we've stated before, when you was talking about maybe an adjournment when John Beason out of Grand Rapids wanted to represent me but he couldn't at this time because he has previous engagements, but --

THE COURT:  He hasn't filed an appearance.

_____

[2]Attorney John R. Beason was petitioner's attorney on criminal charges he faced in federal court.  On May 28, 2002, petitioner pleaded guilty to unlawful transportation of firearms.  On August 28, 2002, he was  sentenced to 26 months' imprisonment.  *United States v. Wheatley*, 1:02-cr-72 (W.D. Mich. 2002).

THE DEFENDANT:  He didn't want to file one or I didn't want him to file one on my behalf until, you know, other things I asked for: a lift of the writ.

THE COURT:  Yes, and I wouldn't lift the writ.  I would adjourn the trial if you had hired a lawyer.

THE DEFENDANT:  Yes.

THE COURT:  Because we're already running the six months.

THE DEFENDANT:  Yes.  Yes, I'm going to go to trial.

THE COURT:  All right.

(docket # 20 at 4-5).

During the December 9, 2002 hearing, petitioner stated on the record that he was rejecting the plea agreement the prosecutor offered:

MR. PRYSOCK:  One final thing, Judge, is the Prosecutor has conveyed to me some negotiations regarding a potential plea agreement and a settlement in this matter.  I have conveyed those to Mr. Wheetley, and Mr. Wheetley does reject the offers at this point in time.  I don't know if Mr. Thiede had offered to meet with the three of us so he could convey them directly to David or David could just tell you here on the record that I have conveyed these various offers to him, which he has rejected.  I don't know how you want to handle that, just to make sure we know that it was done.

THE DEFENDANT:  Your Honor, he conveyed what the Prosecutor said as a plea agreement, and I respectfully declined.

THE COURT:  Well, what was the offer?

THE DEFENDANT:  Ten to thirty, second degree murder.

THE COURT:  Is that what the offer was?

MR. THIEDE:  That is correct.

THE COURT:  All right.

MR. THIEDE:  And of course, attachments of truthful testimony.

-8-

THE DEFENDANT:  Yes.[3]

(docket # 20 at 11-12).

### B.    Trial

Petitioner's trial began December 16, 2002.  At the outset of voir dire, the court advised the panel that petitioner was exercising his constitutional right to represent himself:

> . . . Mr. Wheetley has chose[n] to represent himself.  Now he has a constitutional right to do that.  The Court has assigned an attorney to advise him during the course of the trial.

(TT I, 6).  He asked potential jurors whether petitioner's decision to represent himself would influence their decision.  (TT I, 22, 26, 28, 38).  The preliminary instructions advised the jury that petitioner's decision to represent himself should not impact the jury's decision in any way:

> Now, in this case, the defendant David Wheetley is representing himself.  This fact should not affect your decision in any way.  The defendant has a right to represent himself and has chosen to exercise that right.
>
> As I explained to you, the lawyer, Mr. Prysock, is present if defendant wishes to consult him.

(TT I, 93).

Petitioner's opening statement emphasized that he was representing himself, and that he would continue to do so:

> As you know, I'm the defendant in this case, and, as you know, I'm representing myself.  As we heard, I probably look like a fool to a lot of you.  Part of the reason is because problems with attorneys and me maybe having to sit longer in jail.  I'm innocent of the charges.  And I'm going to continue to represent myself.

---

[3]During the December 9, 2002 hearing, the prosecutor moved to dismiss the conspiracy charge against petitioner in light of the court's rulings in the companion cases against Hobbs and Jones.  Petitioner had no objection, and the case proceeded to trial against petitioner on the other three charges.  (docket # 20 at 12).

(TT I, 98).  Petitioner attempted to interject that, if convicted, he faced a possible non-parolable life

sentence:

> THE DEFENDANT:  . . .  I just hope that you will keep an open mind that I'm not very schooled in the law.  And that I'm going to get emotional.  You'll see me probably get upset or frustrated because it's very personal to me because this is very serious.  This is the most serious case there is.  This is either I never get out of prison or I --
>
> MS. ROACH:  Objection, your Honor.  Mr. Wheetley is dealing with the issue of sentence. I would ask that it be stricken as procured in instruction.
>
> THE COURT:  The court already instructed, the penalty does not have anything to do with your duties.

(TT I, 100).

Petitioner wore leg restraints during the initial day of his trial because there was a

"federal hold" on him.  (TT I, 65).  There is no evidence that the restraints could be seen by the jury.

At the end of the initial day of trial, the court advised petitioner that he would not be required to wear

leg restraints during the remainder of his trial.  An inquiry directed to the Federal Bureau of Prisons

had revealed that it did not have specific leg-restraint restrictions applicable to a federal prisoner

during a state-court criminal trial.  The court was satisfied that other security measures would

prevent petitioner's escape:

> THE COURT:  Last thing.  During one of the intermissions, Mr. Thiede checked with the bureau, and they have no prohibition relative to the leg iron.  Also no problem with the number of police officers in the courtroom.  For that reason, I would allow you to appear in court tomorrow without the leg restraints.
>
> THE DEFENDANT:  Thank you very much.

(TT I, 188-89).

-10-

Douglas Brower testified that on the night of Saturday, March, 4, 2000, he gave his friend Paul Afton a ride to "Woody's Bar."  The bar was crowded for a "hootchie mama [dance] contest."  (TT I, 107, 122).  Brower did not know how much money Afton had on him, but Afton had at least enough money to buy Brower a beer.  (TT I, 108).  Brower and Afton became separated over the course of the evening.  When Brower was ready to leave, he could not find Afton.  On other occasions, Paul Afton had caught rides from others or simply walked home. (TT I, 109-10).  Brower left the bar at around 1:00 a.m. without Afton.  (TT I, 106, 109).  Near closing time, Aaron Thomas saw Paul Afton standing by the bar exit door asking people for a ride and asking where he could get drugs.  Thomas saw petitioner in the bar parking lot at closing time.  (TT I, 124-26, 130).  Aaron Thomas had encountered Afton earlier in the evening in the bar parking lot.  Afton had "folded money" and was looking to buy drugs.  (TT I, 126-27).

Petitioner was at Woody's Bar with Carlton Hobbs and Joseph Jones.  Petitioner and Jones are brothers.  Petitioner and Hobbs are not actually brothers, but petitioner referred to Hobbs as his brother.  (TT III, 437-38).  Witness testimony indicated that petitioner, Hobbs, and Jones were members of the Gangster Disciples or GD gang.  (TT III, 476-77, 511-12, 519-20; TT IV, 644-45).  Petitioner and Hobbs needed money because they were going to be evicted from their residence.  (TT III, 500, 503).  On the night Paul Afton was killed, petitioner was driving a burgundy Pontiac Bonneville.  (TT III, 477).

Dennis Trowbridge was walking from his trailer to a friend's house in the Woodland Park area sometime around 3 a.m. on Sunday, March 5, 2000.  Trowbridge heard multiple voices engaged in what sounded like an argument, followed by several gunshots.  (TT I, 131-34).  Trowbridge saw four muzzle flashes.  (TT I, 142).  He heard car doors slam.  (TT I, 134).

-11-

Trowbridge saw what appeared to be a burgundy-colored car back out onto Blair Avenue. Trowbridge tried to hide, but could not avoid detection.  Someone fired shots at Trowbridge from the passenger's side of the car, and the car sped away.  (TT I, 137, 142, 147-48, 154).  Police later found four .25 caliber shell casings on Blair Avenue and extracted .25 caliber bullets from nearby trees.  (TT I 178, 182-84; TT II 201, 214-15, 312-15).

Dennis Trowbridge went into the wooded  area where the first set of shots had been fired.  He found Paul Afton bleeding from gunshot wounds, trying to get up on his knees, and falling back down.  (TT I, 138).  Trowbridge attempted to talk to Afton, but Afton could not reply. Trowbridge went to the nearby residence of a friend and contacted the police. (TT I, 138-39). Trowbridge's friend, Mrs. Williams, stood out in the roadway and directed police to the scene. Trowbridge attempted to comfort the victim, but Paul Afton died from the gunshot wound to his neck before the police arrived.  (TT I, 141, 159).

Police secured the crime scene.  (TT I, 159-61).  The location in the woods where Afton was killed is approximately one-half mile from Woody's Bar.  (TT II, 214).  Afton's wallet was found approximately thirteen feet from his body and there was no money in it.  (TT I, 181-82; TT II, 202-05, 218, 334).  Afton did have $2 in the left back pocket of his pants.  (TT III, 334). Petitioner's DNA matched the DNA on a cigarette butt found at the crime scene.  (TT II, 368-75). The tire tracks at the scene matched the tread pattern of tires on petitioner's car.  (TT I, 181; TT II 221, 297-99, 344-47, 352-56).

A forensic pathologist testified that Paul Afton had multiple blunt force injuries to his face.  He suffered abrasions and bruising, injuries on his forehead, bridge of his nose, right cheek bone and right eyelid.  (TT II, 248).  The bruising and scraping marks on his hands indicated possible

-12-

defensive wounds. (TT II, 272-73). The nose and forehead wounds suggested blunt force injuries caused by someone stomping on the victim's face. (TT II, 274). Witnesses testified that the victim did not have any such facial injuries when he left Woody's Bar. (TT III, 444-45). Petitioner objected to the admission of autopsy photos. (TT II, 231-32). The objection was overruled. The photographs were evidence that Afton had been assaulted before he was shot and killed. (TT II, 234). The court found that the photos were not inflammatory and admitted them into evidence. (TT II, 236). Paul Afton was shot from four to eight times. (TT II, 290). He was shot in the neck, arms, chest, abdomen, and legs. (TT II, 249-52, 261-78). The powder stippling around Afton's neck wound indicated that the fatal gunshot through his neck had been fired at close range. (TT II, 250-51, 258-59). The shot through Afton's neck passed through his left common carotid artery and left internal jugular vein, causing him to bleed to death. (TT II, 256-57, 271). The neck injuries would have caused Afton to lose consciousness within thirty seconds, and death within two minutes. (TT II, 272, 288). The victim's blood alcohol content was .25. (TT II, 271). He was about five feet, ten inches tall and weighed 190 pounds. (TT IV, 614). Three .38 caliber bullets were recovered from the victim's body. (TT II, 266-68, 279, 313). The most likely explanation for absence of .38 caliber casings at the scene of the shooting was that the weapon had been a revolver-type, and the casings were held inside the gun rather than being ejected. (TT II, 341).

The prosecution's main witness was Dawn Davis. (TT III, 469-527). Ms. Davis had been the girlfriend of Carlton Hobbs, a/k/a Rab or Rabbit. Hobbs had a child from another relationship. Petitioner had a child with Ms. Sara Kaufman. On the night Paul Afton was killed, Dawn Davis was babysitting those children at a Baldwin, Michigan residence petitioner and Hobbs shared. (TT III, 469-71, 514). Petitioner and Hobbs were planning to go to Woody's Bar to watch

-13-

the "bootie shaking" contest.  Petitioner and Hobbs left at 9:00 p.m. and did not return until around 4 a.m. the next morning.  (TT II, 472, 515).  When petitioner returned, he reported that the bar did not have a dance contest, and stated that he and Hobbs had gone to "Shooters" in Big Rapids instead. (TT III, 473).

On March 5, 2000, around noon, Ms. Davis saw a news report stating that a man had been killed near Woody's Bar.  (TT III, 474).  Ms. Davis knew that petitioner and Hobbs had guns. She did not believe the story that they had been somewhere else.  Dawn Davis went back to petitioner's house and inquired about what really happened the previous night.  (TT III, 474, 513). Petitioner then related to Ms. Davis a version of what had happened.

> Q     What did he say?
>
> A     He told me that he needed my help; that he did the murder that night; that he needed an alibi, to let the cops know, if they asked me any questions, that they got home 15 minutes before the murder happened.
>
> Q     What time were you supposed to tell the police they got home?
>
> A     I believe it was around 15 until 11 at night.  I'm not exactly sure of that time.
>
> Q     What did you say to David Wheetley at that point?
>
> A     I told him I knew he did it.  And I asked him why.
>
> Q     What did he say?
>
> A     He told me that the man was talking about his money situation in the bar and --
>
> Q     The man who was killed?
>
> A     Yes.  The man who was killed.  And he said that --
>
> Q     He being David?

-14-

A       David, yes.  He told me that he had listened in on his conversation and how much this man had in his wallet, so.

* * *

Q       And what did he say?

A       He told me that he had followed the man out, him and Carlton and Joseph followed the man out of the bar; that they had gotten into their car, David's car, and followed the man.  He said then Joe used the gun and shot at the man.  He said that if Joe did it, he would get off because he was under age.  And he told me that once Joe shot the man, he did not fall, so they all got out of the car and started beating on him to make him fall.  He said the guy was a big guy, six foot 2, six foot 3, and he fought to stay up.  He said that once they got the man down, that he had Joe grab for the wallet.  He said at that time Joe picked up the wallet, looked in it, there was nothing in it but some crack and some weed.  He said at that time a witness, another man came out and had said something and they -- Joe had dropped the wallet and the man had started -- they started shooting at the man and left.

Q       Did David make any references to why you were chosen as an alibi.

A       He told me this was GD.

Q       Let me stop you there.  What's that?  What's that mean?

A       Means their gang.  Whatever gang they were in.

* * *

Q       Did he tell you what happened after the shooting at the man who walked up?

A       Yes.

Q       What did David say to you?

A       He told me that after that happened, he went to my house in Star Lake.[4]  They all changed their clothes.  Joe took them somewhere in Star Lake to where they could burn the clothes.  After they did that, he said they went and took Joe home and went to bury the guns in Irons where nobody would find them.

---

[4]Dawn Davis had allowed her boyfriend Hobbs to keep some of his clothes at her house.  (TT III, 493).

-15-

Q       Did you notice something unusual about David Wheetley's clothing when you were talking to him that day?

A       Yes, I did.

Q       What did you notice?

A       I noticed he had blood on his pants, on his right leg.

Q       Where on his pants?

A       On the cuff of his pants.

Q       Do you recall what kind of pants he was wearing?

A       He was wearing like dark blue jeans.

Q       Now you say you noticed it was blood?

A       Yes.

Q       How did you know it was blood?

A       It was red.  It was all over the bottom of his cuff.

(TT III, 475-78).

For a brief period in February of 2000, Dawn Davis had allowed Hobbs and petitioner to stay at her place.  It was there Davis saw petitioner with two guns:

Q       Okay.  Specifically, as to David Wheetley, do you recall what kind of gun you saw him with?

A       I saw him with two guns.

Q       Could you describe those guns for the jury, please?

A       Yes, I could.  There was a silver gun, that was a handgun, it could lay in your hands.  And the other one was a cop gun, looked like a cop gun.  It was a pistol with a long black barrel and a dark brown handle.

-16-

(TT III, 484).  Davis testified that in February 2000, she overheard petitioner purchasing the larger revolver-type gun, and she saw petitioner with it after the transaction had been completed.  (TT III, 486-87, 496-97).  Petitioner brought both guns to Ms. Davis's house because he thought the police were watching his house.  (TT III, 487).  Davis testified that after Carlton Hobbs was arrested, petitioner threatened to kill her if she said anything to the police.  (TT III, 483, 496, 506).  Dawn Davis fled the State of Michigan and moved to New York.  (TT III, 481, 496, 499, 505, 509-10, 526).

Noel Duffing testified that in February 2000, he sold petitioner an unregistered .25 caliber automatic handgun at his barbershop.  (TT III, 397-401).  Upon cross-examination, Duffing testified that he bought the .25 caliber gun from a man named "Tommy," but did not know the man's last name.  (TT III, 396-413).  Multiple witnesses testified that they saw petitioner with a .25 caliber gun during the weeks before Paul Afton was killed.  (TT III, 416, 426-27).  The following exchange occurred during petitioner's cross-examination of Noel Duffing regarding the number of times Duffing had told the police that he did not sell a gun to petitioner:

Q      Now, do you recall being questioned by detective -- well actually, a lot of detectives on three [sic] numerous occasions this year?

A      Yes.

Q      Do you remember on two of those occasions that you said I don't know nothing.  I've never sold Mr. Wheetley anything.  Do you recall that?

A      One occasion.

THE DEFENDANT:  If I may approach, your Honor?

THE COURT:  Well, he can --

THE DEFENDANT:  I just want to refresh his memory with the statements, if that's possible.

-17-

MS. ROACH:  If I can interpose an objection.  He hasn't established that the witness has no recollection or that his recollection needs to be refreshed.

THE DEFENDANT:  I'm sorry.

MS. ROACH:  In fact, the witness told him he did say that.

THE DEFENDANT:  He said on one occasion.

BY THE DEFENDANT:

Q       Is it possible that maybe you said it on two occasions and you don't remember, Mr. Duffing?

A       I talked to them on other occasions.  There was only one occasion I said that.

THE DEFENDANT:  Now with that, your Honor, may I refresh his memory?

THE COURT:  Yes.

MS. ROACH:  He hasn't established yet, your Honor, that the witness has a problem with his recollection.

THE DEFENDANT:  Your Honor, I have police reports that say otherwise.

MS. ROACH:  Your Honor, Mr. Wheetley is not entitled --

THE COURT:  David, those police reports, if they were reliable evidence, they would be in front of the jury.  They are just hearsay.  You have to accept his statements.

THE DEFENDANT: Okay.

BY THE DEFENDANT:

Q       So you did make at least one prior statement?

A       Yes, sir.

Q       That you never sold me nothing, or you don't know what they are talking about?

A       Yes, sir.

(TT III, 403-04).

-18-

Naomi Willette, petitioner's former girlfriend, testified that in July or August of 2000 she overheard a conversation in her apartment involving petitioner, Joseph "Joe" Jones, and Carlton Hobbs[5]. Ms. Willette heard something about the guy these men shot in Woodland Park. Later, petitioner informed Willette that his little brother "Joe" did the shooting. Petitioner warned Naomi Willette that she would be "hit" if she ever told the police. (TT III, 449-52, 457-59). During cross-examination, petitioner asked Ms. Willette whether she had seen him with any kind of weapon. Willette gave a qualified response, stating that she had never seen petitioner with guns:

Q      Have you ever seen me with any kind of weapon?

A      I've not seen you with any guns.

(TT III, 453). On re-direct examination, the prosecutor asked Ms. Willette whether she had seen petitioner with any weapons other than guns, and over petitioner's objection, the court allowed the question. Ms. Willette stated that she had once seen the petitioner with a grenade:

Q      Mr. Wheetley asked you on cross-examination if you have ever seen him with any weapons and your answer was not guns?

A      Yes.  I have seen him with --

THE DEFENDANT:  Objection.

MS. ROACH:  I haven't asked a question yet.

THE COURT:  What is the nature of your objection?

THE DEFENDANT:  She's trying to draw an inference.  The question was asked and answered, did she see me with any guns.  She answered no.  So she should ask another question.

MS. ROACH:  He opened the door.  I'm walking through it.

---

[5]Outside the presence of the jury, Joseph Jones and Carlton Hobbs had invoked their Fifth Amendment rights against self-incrimination and refused to testify.  (TT III, 393-95).

THE COURT:  She can inquire relative to -- this is appropriate line of questioning.

THE DEFENDANT:  If it pertains to this murder, your Honor.

THE COURT:  Your objection is overruled.

THE DEFENDANT:  Thank you, your Honor.

BY MS. ROACH:

Q       Have you seen David Wheetley with weapons other than guns?

A       Yes, ma'am.

Q       What weapons?

A        A grenade.

(TT III, 459-60).  The witness had seen petitioner with a grenade sometime after the discussion Ms.

Willette had overheard between petitioner, Jones, and Hobbs about the shooting near Woody's Bar.

(TT III, 461-62).  Ms. Willette testified that the grenade had nothing to do with petitioner's trial for

killing Paul Afton.  (TT III, 462).

        Natasha Ivy testified that she had dated petitioner's brother, Joseph Jones.  (TT III,

538).  Petitioner told Ivy that he had been at Woody's Bar on the night of the shooting.  (TT III, 541).

Ms. Ivy had seen petitioner with a brown and black handgun in the months before the shooting.  (TT

III, 546-47).  Ivy testified that a month or two after the shooting, she was walking home along

Highway 10 in the early morning hours with Erica Darknell when a car pulled up alongside them.

Petitioner and Hobbs were inside it.  Ms. Ivy stated that it was on this occasion that petitioner

disclosed that he had disposed of the gun.  (TT III, 543-46).

        Ericka Darknell had seen petitioner with a handgun.  (TT III, 559).  She later

overheard petitioner saying that he and two others had killed a man over a pool game at Woody's

Bar.  (TT III, 555-60, 571).  Ms. Darknell testified about the night she and Natasha Ivy had encountered petitioner and Hobbs on Highway 10.  Ms. Darknell could not recall what petitioner said, but she did recall discussing with Ivy the possibility that petitioner and Hobbs had disposed of a gun in the river.  (TT III, 570-72).

Petitioner discussed Afton's murder with his co-worker and friend Larry Owens. Their initial conversation occurred shortly after the killing.  Petitioner had paced the floor and expressed concern that police were trying to implicate him in the murder.  (TT III, 421-22).  In a subsequent conversation, six months to a year later, petitioner expressed frustration about a gun having been found at his mother's boyfriend's house.  Petitioner's mother had apparently found a gun and called the police.  (TT III, 422-25).  According to Owens, petitioner blurted out that he hoped "Joe didn't find that gun or dig that gun up.  It was used in the Woodland Park murder."  (TT III, 423, 427-28,  435).  Owens had never seen petitioner with a .38, but he had seen petitioner with a .25 caliber, silver or nickel-plated, automatic handgun about a month before Paul Afton was shot and killed.  (TT III, 425-28).  Sean Vida had also seen petitioner with a silver, automatic, .25 caliber handgun.  (TT III, 416).

Detective Richard Miller of the Michigan State Police was the initial homicide investigator.  (TT II, 293).  Miller described steps taken to secure crime scene and how evidence had been gathered.  Miller testified that the victim's belt had been unbuckled, the top snap of his pants undone, and the zipper was down about three-quarters of the way.  (TT II, 310).

Detective Miller testified that he first interviewed petitioner at petitioner's place of employment on March 10, 2000, five days after Paul Afton was killed.  (TT II, 319).  Petitioner's

responses during this initial interview revealed that he had knowledge about the victim's pants that had never been made available to the public:

Q    When you talked to him on March 10th, what did you ask him?

A    I asked him if he was off probation that evening, I asked him who he was in company with, when he arrived at the bar, when he left, showed him some photographs, asked him if he could recognize them, and asked him if he could give me names of other people he might know that frequented the bar that night.

Q    And were these questions that you asked the other persons who reported to you to have been at the bar Saturday night?

A    That's correct.

Q    What did Mr. Wheetley tell you?

A    Well, first of all, I showed him a photograph of the victim.  He told me he did not recognize the fella and did not believe he had met him.  I showed him a photograph of Doug Brower who I knew had accompanied Mr. Afton to the tavern.  Mr. Wheetley said he recognized Mr. Brower.  And he described the scenario where Mr. Brower had some sort of a verbal altercation with another white male.  I had asked him which vehicle he drove.  He identified his vehicle to me.

Q    And what vehicle was that?

A    It was a 1990 model Pontiac Bonneville which was a burgundy color.  And that the vehicle, as I spoke to him in the parking lot of employment, he pointed to his vehicle and it was across the parking lot.  And getting the license plate off that, I discovered it was owned by Sara Kaufman, who he had described to me as his girlfriend, and they shared a child in common.  Mr. Wheetley made some comments to me about what he had heard about the murder.

Q    And what did he tell you he heard?

A    He told me that the street talk, that the dead man had his pants unzipped, and that he had been shot in the back of the head, and that the shooting was over dope.

Q    You knew Paul Afton's pants were unzipped when he was found; correct?

A    That's correct.

-22-

Q      Did any of the other people you interviewed who were at the bar that Saturday night into Sunday morning, did any of them know that Paul Afton's pants were unzipped?

A      No one described to me that they knew the victim's pants were unzipped.

Q      Had that information been shared in the community to your knowledge?

A      It was not.

(TT II, 320-21).

      Detective Miller's second conversation with petitioner occurred when Miller and Detective Hankey stopped at Sara Kaufman's residence to interview her.  Ms. Kaufman was not at home, but petitioner arrived and he invited the detectives inside.  Petitioner repeated his description of the car he had been driving, the people he had been with, and the time they left Woody's Bar.  (TT II, 323-24).

      Miller's third contact with petitioner occurred when petitioner called the State Police Post in Newaygo:

Q      And did he tell you why he called?

A      He was irritated with me.

Q      Did it have to do with the homicide, or the homicide investigation?

A      He felt it did.

Q      Did he make any reference to the homicide or the investigation in that telephone conversation he initiated?

A      He accused me of having a personal interest in causing him difficulty in another matter he had pending.

Q      Do you bear any personal animosity toward Mr. Wheetley?

A      On a personal basis, I don't know the man.

-23-

(TT II, 325).

Detective Sergeant Scott Rios of the Michigan State Police became involved in the Afton homicide investigation in August 2001.  (TT IV, 601).  Rios interviewed petitioner at the Michigan State Police Post in Niles, Michigan in late March or early April 2002.  Petitioner related that Joe Jones and Carlton Hobbs had been with him at Woody's Bar on the evening when Afton was killed.  (TT IV, 608).  Petitioner reiterated that he drove a Pontiac Bonneville, maroon in color, that had been registered to Sara Kaufman.  (TT IV, 609, 628-29).  Petitioner stated that he, Jones, and Hobbs had stayed at Woody's Bar until closing time.  (TT IV, 608).

During petitioner's cross-examination of Detective Rios, the court sustained an objection to one of petitioner's questions:

Q      Okay.  This was your first case as a detective.  Is that what you testified to?

A      My first homicide case; yes, sir.

Q      First homicide case?

A      Yes, sir.  I been --

Q      A lot of pressure was on you to get this case solved; isn't it?

MS. ROACH: Object.

THE COURT: Sustained.  Not an appropriate question.

(TT IV, 619).  Petitioner did not seek any clarification of the court's ruling and he continued with his cross-examination of Rios.  (TT IV, 619-27, 63-35, 637-39, 641).

Petitioner cross-examined Detective Rios regarding Rios's perception of one of their conversations:

-24-

Q    What was your perception of our conversation, that maybe I knew something, but wasn't telling you?

A    With the inconsistencies of the statements, your comment initially, in the review of a police report about the position of the body, as well as your statement that we didn't have the gun, I felt you were involved with this, sir.

Q    What statement of the position of the body?

A    The initial statement you made to Detective Miller.

Q    About his pants being unzipped?  Is that what you are referring to?

A.    Correct sir.

(TT IV, 631-32).  One of the inconsistencies noted by Detective Rios was petitioner's statement that he had sold the Bonneville to Carlton Hobbs and hadn't seen the car in two years.  As it turned out, petitioner had been Joseph Jones's passenger in the Bonneville when Jones was stopped by Indiana police for license violations.  (TT IV, 637-39).

Detective Miller was recalled to the stand.  Miller testified that during the April 3, 2001 interview, petitioner indicated that he was a member of the Gangster Disciples.  (TT IV, 642-43).  Petitioner consistently stated that he had been accompanied by Carlton Hobbs and Joseph Jones on the night Paul Afton was killed:

Q    Did he identify the persons with whom he traveled to and from?

A    He did.

Q    And those persons were who, according to Mr. Wheetley?

A    Both my personal interviews with him on 10th of March, 2000, then again on April 3, 2001, he represented that night he was in the company with two brothers, Carlton Hobbs and Joseph Jones.  He again reiterated that they drove his burgundy colored Bonneville and that he was the driver of the vehicle and that he drove to and from the bar that evening.

-25-

(TT IV, 644-45).

Upon cross-examination, Detective Miller conceded that his April 3, 2001 report made no mention of petitioner's affiliation with the Gangster Disciples. (TT IV, 645-46). Petitioner cross-examined Miller regarding his March 10, 2000 report:

> Q   Do you recall testifying yesterday, or the day before maybe, that on March 10 you interviewed me at my job?
>
> A   I did.
>
> Q   And that I gave reference to Paul Afton's pants being unzipped?
>
> A   That, and then the fact that a witness got shot; yes.
>
> Q   And you said that was in the report; didn't you.
>
> A   It is.

(TT IV, 646-47).  Petitioner had a problem locating page 16 of Miller's report.  The court took up the matter outside the presence of the jury.  (TT IV, 648).  The prosecutor stated that she had provided petitioner with all police reports, including a complete copy of the report at issue. Petitioner was provided with another copy of page 16 of Miller's March 10, 2010 report to allow him to complete his cross-examination.  Petitioner elected to immediately terminate his cross-examination and did not pose any further questions to Detective Miller.  (TT IV, 667).

Tommy Hollifield was one of six witnesses petitioner called.  (TT IV, 671-727). Upon direct examination, Hollifield testified that he never sold Noel Duffing an unregistered handgun. (TT IV, 672).  He added, "I may have sold him one gun at one time or another -- I'm not sure -- four or five years ago." (TT IV, 672).  Upon cross-examination, Hollifield testified that he "may have sold him one gun" but stated, "I don't remember exactly what it was."  (TT IV, 673).

-26-

When asked if it was a .25 caliber, he replied, "I'm not sure."  (TT IV, 673).  Throughout his testimony Hollifield insisted that he did not sell an unregistered handgun.  (TT IV, 672-74).

The prosecution called one rebuttal witness before the close of proofs.  (TT V, 745-53).  The prosecutor's closing argument focused on her burden of proving beyond a reasonable doubt every element of the crimes charged.  (TT V, 776).  One sentence of the prosecutor's argument indicated that Hollifield testified that he had sold Duffing a .25 caliber automatic rather than that Hollifield could not recall the type of gun he sold:

> It is the defendant who bought guns.  Dawn Davis told you she saw and heard the sale of a pistol.  A revolver to David Wheetley.  It was stored at her house, her apartment at one point.  You heard from Tommy Hollifield that he sold a 25 automatic to Noel Duffing.  And Noel Duffing told you David Wheetley is the one who wanted the 25 and that Noel Duffing sold it to David Wheetley a month before Paul Afton was murdered.

(TT V, 777-78).

Petitioner's closing argument began and concluded with emphasis on the fact that he was representing himself.  (TT V, 785, 797-98).  During his closing, petitioner made the following argument regarding Mr. Hollifield's testimony: "You heard from Mr. Hollifield who stated that he has never sold Mr. Noel Duffing an unregistered gun.  And when asked if it was a 25, he stated, I don't know.  He said that two, three years ago he sold him a registered gun that wasn't in a paper bag as Noel Duffing testified to or in a box."  (TT V, 790).

Judge Thomas delivered the jury instructions without objection from either party.  He gave the following instruction regarding petitioner's decision to represent himself:

> In this case, the defendant is representing himself.  This fact should not affect your decision in any way.  The defendant has a right to represent himself.  And he has chosen to exercise that right.

> The lawyer, Mr. Prysock, has been present and the defendant has consulted him, as you've noticed, throughout the trial.

(TT V, 755).   The jury received the standard instruction that the closing arguments were not evidence.  (TT V, 756).

On December 20, 2002, the jury returned verdicts finding petitioner guilty of first-degree felony murder, aiding and abetting in an armed robbery, and possession of a firearm during the commission of a felony.  (TT V, 818-19).  On January 28, 2003, the court sentenced petitioner to the mandatory life without parole on the first-degree felony murder conviction, and 2 years on a felony-firearm conviction (to be served consecutively).  Judge Thomas vacated the armed robbery conviction on double-jeopardy grounds, because it served as a predicate offense for petitioner's first-degree felony murder conviction.  (Sentencing Transcript (ST) at 7-8, docket # 26).  The court advised petitioner of his appeal rights, and petitioner signed his appeal papers in open court.  Judge Thomas encouraged petitioner to utilize the services of appointed appellate counsel.  Petitioner replied that he would do so:  "I learned my lesson representing myself, definitely."  (ST, 10).

## C.   Appeal as of Right to Michigan Court of Appeals

Petitioner appealed as of right to the Michigan Court of Appeals.   On appeal, petitioner was represented by Attorney Gary L. Rogers of the State Appellate Defenders Office. Appellate counsel raised the following five issues:

I.   WAS MR. WHEETLEY DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHERE HE WAS CONVICTED, IN PART, BASED ON UNFAIRLY PREJUDICIAL CHARACTER EVIDENCE AND UNSUBSTANTIATED HEARSAY?

A.   WAS MR. WHEETLEY DENIED HIS RIGHT TO A FAIR TRIAL BY THE USE OF UNFAIRLY PREJUDICIAL EVIDENCE, NAMELY THAT A

-28-

WITNESS HAD SEEN HIM WITH A GRENADE SOME MONTHS AFTER THE HOMICIDE HERE?

B.    WAS MR. WHEETLEY'S RIGHT TO A FAIR TRIAL IMPAIRED BY VAGUE REFERENCES TO BAD CHARACTER DELIVERED BY A POLICE OFFICER, THE FORMER OFFICER IN CHARGE OF THE CASE?

C.    DID THE TRIAL COURT REVERSIBLY ERR BY ADMITTING INADMISSIBLE HEARSAY?

II.    WAS MR. WHEETLEY DENIED HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY THE PROSECUTOR'S MISCONDUCT, WHERE THE PROSECUTOR MISLED THE JURY ABOUT RECORD TESTIMONY TO CONNECT MR. WHEETLEY TO THE TYPE OF GUN USED IN THE HOMICIDE AND WHERE THE PROSECUTOR TOOK ADVANTAGE OF THE *PRO PER* DEFENDANT TO PORTRAY HIM AS A VIOLENT INDIVIDUAL?

III.    DID THE TRIAL COURT VIOLATE MR. WHEETLEY'S DUE PROCESS RIGHT TO A TRIAL BY AN IMPARTIAL JURY BY PERMITTING JURORS TO SUBMIT QUESTIONS FOR WITNESSES DURING THE TRIAL?

IV.    WAS MR. WHEETLEY DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE AND TO CROSS-EXAMINE WITNESSES, AS WELL AS HIS STATE-CREATED RIGHTS UNDER THE RULES OF EVIDENCE?

V.    WAS MR. WHEETLEY DENIED HIS RIGHT TO A FAIR TRIAL BY THE CUMULATIVE EFFECT OF THE ERRORS?

(Statement of Questions Presented, Defendant-Appellant's Brief at vi-vii, found in Michigan Court of Appeals record, docket # 27).  Petitioner filed a *pro se* brief raising four additional issues: (1) insufficiency of the evidence to support his first-degree felony murder conviction; (2) an alleged violation of the court's discovery order when the prosecutor failed to give full disclosure of all police reports; (3) a due process violation based on showing the victim's autopsy photographs; and (4) trial court error "in not *sua sponte* instructing the jury on the cognate lesser included offense of second

degree murder, after it granted an instruction on manslaughter."   (Defendant-Appellant's *Pro Se*
Supplemental Brief at vi, found in Michigan Court of Appeals record, docket # 27).

On October 28, 2004, the Michigan Court of Appeals affirmed petitioner's
convictions and sentence.  (10/28/04 Op., docket # 27).  The arguments petitioner raised in his
supplemental *pro se* brief warranted little discussion.  The Court of Appeals found no merit in
petitioner's challenge to the sufficiency of the evidence supporting his first-degree felony murder
conviction.  The court, applying the familiar *Jackson v. Virginia*  standard,[6] found "overwhelming"
evidence of petitioner's guilt:

> Here, the evidence adduced by the prosecution was overwhelming.  In addition to the
> evidence regarding the victim's pants, evidence regarding the victim's own incriminating
> statements, the tire tread analysis, the DNA analysis, and concerning the weapon used to kill
> Afton all pointed to defendant's guilt.

(Op., 6-7).

The Court of Appeals rejected petitioner's argument that he had been denied due
process when the prosecution "failed to turn over a page in a police report that contained a notation
by Detective Miller that defendant had shown knowledge of the victim's pants that was not released
to the general public."  (Op., 6).  There was "no evidence that the prosecution suppressed the page
at issue."  (*Id.*).  "In any event, even assuming that defendant was not given a copy of the page before
trial, defendant is unable to show that he was denied due process because he cannot show that the
outcome of the trial would have been different if he had been given this unfavorable evidence
sooner."  (*Id.*).

---

[6](Op. at 6) (citing *People v. Johnson*, 597 N.W.2d 73, 75 (Mich. 1999) which in turn cited
*Jackson v. Virginia*).

The Court of Appeals rejected petitioner's argument that admission of autopsy photographs had deprived him of a fair trial. (Op., 7). It found no merit in petitioner's argument that the trial court judge should have *sua sponte* delivered a second-degree murder jury instruction. (*Id.*).

The Michigan Court of Appeals devoted the majority of its opinion to addressing the somewhat more substantial issues raised by petitioner's appellate counsel. It rejected the argument that admission of prejudicial character evidence and hearsay had violated petitioner's due-process rights. (Op., 1-3). Petitioner had placed his character at issue when he asked Naomi Willette whether she had seen him with any kind of a weapon:

> Defendant opened the door to the prosecutor's question when he asked if Willette had ever seen him with "any kind of weapon." Under these circumstances, it was proper for the prosecutor to determine if Willette had seen defendant with "any kind of weapon" other than a gun. Further, to the extent that defendant was using the question in an attempt to place his character before the jury, the follow-up question was permissible. "Once a defendant has placed his character in issue, it is proper for the prosecution to introduce evidence that the defendant's character is not as impeccable as is claimed." *People v Vasher*, 449 Mich. 494, 503; 537 N.W.2d 168 (1995). See also MRE 404(a)(1). Therefore, the trial court did not abuse its discretion in admitting this testimony.

(Op., 2).

The appellate court rejected petitioner's argument that Detective Miller's testimony had deprived him of a fair trial. Petitioner argued that three portions of Miller's testimony had deprived him of a fair trial: (1) Miller's "having information about 'some activity' involving defendant prior to his identification as a suspect in this case; (2) defendant's being on probation at the time of the shooting; and (3) defendant's accusation that Miller was causing defendant 'difficulty in another matter.'" (Op., 2). The Court of Appeals observed that none of the purportedly offending portions of Miller's testimony had been the subject of an objection. Accordingly, petitioner forfeited

appellate review of these issues except for plain error.  (*Id.*).  Further, none of Miller's statements

had deprived petitioner of a fair trial:

> In this case, Detective Miller's statements had minimal prejudicial value.  He did not make reference to any specific type of crime or conviction.  The vague references to "some activity" and "another matter" are not inherently prejudicial, and we do not believe that they could have diverted the jury's attention from the relevant evidence.  *People v Eaton*, 114 Mich App 330, 337; 319 NW2d 344 (1982).  While the reference to probation does infer conviction for some criminal behavior, we do not believe that when viewed in the context of the evidence presented that defendant's substantial rights were affected.

(Op., 3).

The Court of Appeals rejected petitioner's argument that hearsay testimony by Erica

Darknell had deprived him of a fair trial.  The issue had not been preserved by objection (Op., 3),

and "no error [had] occurred, plain or otherwise:"

> Darknell had testified that she had heard street talk about defendant's involvement in some criminal activity.  In response to a jury question about the substance of the rumors, Darknell testified, "There was [sic] many different rumors about him beating a man by a dumpster, about him shooting a man."  Defendant argues that this response constituted inadmissible hearsay.  We disagree.
>
> "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c).  Out-of-court statements not offered for the truth of the matter asserted do not constitute inadmissible hearsay under MRE 801(c).  *People v Byrd*, 207 Mich App 599, 603; 525 NW2d 507 (1994).  In context, it is clear that the testimony was not offered to establish that defendant had beaten a man and shot a man, but as a clarification on why Darknell suspected that defendant had disposed of a gun in a river.  Thus, no error occurred, plain or otherwise.  Furthermore, defendant has not been able to establish that his substantial rights were affected in light of the overwhelming evidence of guilt presented at trial.

(Op., 3).

The Court of Appeals rejected petitioner's argument that prosecutorial misconduct

in closing argument had deprived him of a fair trial:

> The witness, Tommy Hollifield, had testified that he thought he had sold a gun to Noel Duffing, the proprietor of a barbershop frequented by defendant. When asked if the gun was a .25 caliber, Hollifield responded, "I'm not sure." During her closing argument, the prosecutor recounted that Hollifield had testified that he had sold a .25 caliber gun to Duffing. While this was a mischaracterization of the testimony, we do not believe that defendant's substantial rights were affected by this plain error. [*People v*] *Jones*, [468 Mich 345,] 355 [662 NW2d 376, 382 (2003)]. Other evidence adduced at trial established defendant's possession of a .25 caliber handgun prior to the murder. The fact that a link cannot be established between Duffing and Hollifield does not undermine the reliability of that evidence. Further, as previously noted, the weight of the evidence presented establishing defendant's involvement in the murder was overwhelming.

(Op., 4).

The appellate court found that petitioner had not preserved any objection to questions by jurors. Michigan law permits such questioning. MICH. CT. R. 2.513(I). The trial court judge screened all the juror questions, and no improper questions were posed. (Op., 4-5).

Petitioner argued that his rights to present a defense and to cross-examine witnesses had been violated because he was not allowed to impeach Noel Duffing with two prior inconsistent statements made to the police. (Op., 5). The Court of Appeals found no merit in this argument because it was based on a mischaracterization of what petitioner had attempted to do with Duffing's statements:

> Contrary to defendant's assertion on appeal, the lower court record establishes that defendant attempted to admit the evidence in order to refresh Duffing's recollection, not to impeach him. However, as the court concluded, defendant failed to lay the proper foundation for the admission of the statements. *People v Hawkins*, 114 Mich.App 714, 725; 319 NW2d 644 (1982).

(Op., 5). The Court of Appeals likewise found "no merit" in petitioner's related argument that the trial court had abused its discretion by refusing to allow him to explore the bias on the part of Detective Sergeant Rios by sustaining an objection to one of petitioner's questions. (Op., 5).

-33-

The Michigan Court of Appeals rejected petitioner's argument that the cumulative effect of errors had deprived him of a fair trial. (Op., 5-6).

Petitioner sought review of the above-referenced issues in Michigan's highest court. On September 28, 2005, the Michigan Supreme Court denied petitioner's application for discretionary review. (9/28/05 Order, found in Michigan Supreme Court record, docket # 28).

**D.** **Post-conviction Proceedings in State Court**

On December 28, 2005, petitioner filed a motion for relief from judgment under Rule 6.500 of the Michigan Court Rules raising four issues:

1. Whether petitioner's conviction must be reversed because the waiver of his right to counsel was constitutionally inadequate where he did not make an unequivocal request to represent himself and he was not advised of the pitfalls of self-representation;

2. Whether petitioner was denied equal protection and due process of law by the trial court's refusal to grant funds for an investigator;

3. Whether petitioner was denied due process of law and a fair trial when he was forced to appear before the jury in leg restraints; and

4. Whether petitioner was denied the effective assistance of counsel when his appellate counsel failed to raise the issues petitioner raised in his motion for post-conviction relief.

On April 19, 2006, Judge Thomas denied petitioner's motion for post-conviction relief because all the issues raised were "without merit." (4/19/06 Order, found in Michigan Court of Appeals Record, docket # 29).

Petitioner sought leave to appeal the same four issues to the Michigan Court of Appeals. On December 6, 2006, the Michigan Court of Appeals denied petitioner's delayed

application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  (12/6/06 Order, docket # 29).

On January 4, 2007, petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same four issues.  Among other things, he argued that the preliminary examination transcript revealed "that the Court did not comply with MCR 6.005(D), [because] the Court did not advise Mr. Wheetley of the charge, the maximum possible prison sentence, and more importantly, the 'risk involved in self-representation.'"  (Application for Leave to Appeal at 14, found in Michigan Supreme Court record, docket # 30).  He argued that he had never been "advised of the pitfalls of self-representation." (*Id.*).  Petitioner did not mention his July 2, 2002 arraignment, where Judge Thomas had inquired regarding petitioner's background and education, and  reviewed with him at length the maximum sentence he faced and the pitfalls of self-representation.  On June 15, 2007, the Michigan Supreme Court remanded the matter to the Newaygo County Circuit Court for further proceedings to determine whether the waiver of counsel requirements of MCR 6.005(D) had been met.  The Michigan Supreme Court retained jurisdiction.  (6/15/07 Order, found in Michigan Supreme Court record, docket # 30).

On August 22, 2009, Judge Thomas entered his response to the Michigan Supreme Court's order.  The trial judge ordered a transcript of petitioner's Newaygo County Circuit Court arraignment, and certified in his response that the transcript provided a record of the court's compliance with MCR 6.005(D) and petitioner's unequivocal waiver of his right to counsel.  Judge Thomas also advised the Michigan Supreme Court that "the services of court appointed counsel were continuously afforded to the defendant through the trial and sentencing hearing." (8/22/07 Response,

docket # 30).  The appellate record shows that the Michigan Supreme Court received the transcript

on August 29, 2007.

On September 24, 2007, the Michigan Supreme Court entered its order denying

petitioner's application for leave to appeal:[7]

> By its order of June 15, 2007, this Court remanded this case to the Newaygo Circuit Court,
> while retaining jurisdiction, to determine whether MCR 6.005(D) had been complied with.
> The circuit court's response having been received, the application for leave to appeal the
> December 6, 2006 order of the Court of Appeals is again considered, and it is DENIED
> because the defendant has failed to meet the burden of establishing entitlement to relief under
> MCR 6.508(D).

(9/24/07 Order, docket # 30).

### E.     Habeas Corpus Petition

On April 28, 2008, petitioner filed his petition for federal habeas corpus relief.  He

filed his amended petition on June 11, 2008.  Petitioner raises three grounds asserted by his appellate

counsel, two grounds he presented on direct appeal in his supplemental brief, and the four grounds

from his motion for post-conviction relief.

### Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment

of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"),

---

[7]On February 21, 2008, five months after the Michigan Supreme Court denied his application
for leave to appeal, petitioner attempted to file papers in the closed case asserting that the transcript
of his arraignment had been "fabricated."  It is not necessary to address petitioner's preposterous
assertion herein because the Michigan Supreme Court rejected the papers.  Thus, they are not part
of the state-court record before this court for purposes of habeas corpus review.  *See Cullen v.
Pinholster*, 131 S. Ct. 1388, 1398 (2011) (court must adjudicate habeas claims on record before state
court).

the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined

-37-

by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted).   A federal court may grant relief under the "unreasonable application" clause if that state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should apply or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010).

## Discussion

Respondent raises the defense of procedural default to petitioner's Grounds I, II, and VI-IX.  (Answer to Am. Petition, docket # 12).   Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of a federal claim, unless the habeas petitioner can show cause for the procedural default and prejudice attributable thereto.  *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012).  The doctrine of procedural default is applicable where petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the

-38-

state courts, and the procedural rule is "adequate and independent." *See Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011); *VanHook v. Bobby*, 661 F.3d 264, 269 (6th Cir. 2011). The state may assert a procedural default when the last reasoned opinion of the state courts clearly relies on a procedural bar in refusing to consider a claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If a petitioner is guilty of a procedural default in the state courts, the federal habeas court will only entertain the defaulted issue if petitioner bears the burden of showing cause and prejudice or can show actual innocence. *Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994).

Here, it is not necessary to determine whether grounds I, II, and VI-IX are barred by procedural defaults. The Supreme Court and the Sixth Circuit have indicated that the district court has discretion to ignore procedural defaults and proceed directly to the merits of apparently defaulted claims, when to do so would be more expeditious than an analysis of the complicated procedural default questions. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009). All the grounds raised by petitioner are meritless, so a detailed analysis of the complicated procedural default issues is unnecessary.

## I.      Evidentiary Rulings

In ground I,  petitioner argues that the trial court's admission of unfairly prejudicial character evidence and unsubstantiated hearsay deprived him of a fair trial. Specifically, he argues:

(A) that Naomi Willette's testimony that she had seen him with a grenade was "unfairly prejudicial character evidence" portraying petitioner "as a violent man who would resort to the use of extremely destructive weapons in order to exact revenge;"

(B) that Detective Miller's testimony was improper evidence of petitioner's bad character; and

-39-

(C) that the trial court "erred reversibly" in admitting hearsay testimony from Erica Darknell. (Pet. Brief at 18-25).

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction" because "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

The Michigan Court of Appeals held that admission of the evidence from Willette, Miller, and Darknell did not deprive petitioner of a fair trial. (Op., 1-3). I agree. Petitioner asked Ms. Willette whether she had ever seen him with "any kind of weapon." Willette's somewhat unresponsive initial answer was that she had never seen petitioner with guns, but her cross-examination testimony was that she had once seen petitioner with a grenade. There was nothing unfair or unduly prejudicial in obtaining an accurate response from Ms. Willette to the question petitioner himself asked. Miller's passing reference to probation was isolated and inconsequential. His vague references to "another matter" and "some activity" were not prejudicial. If anything, they avoided introducing petitioner's other legal problems into this trial. Darknell's reference to rumors was not to prove that any rumor was true, but to explain why she suspected that petitioner had disposed of a gun in the river. None of these instances deprived petitioner of a fair trial. I find that

the decision of Michigan Court of Appeals easily withstands scrutiny under the deferential standards of 28 U.S.C. § 2254(d).

## II.    Prosecutorial Misconduct in Closing Argument

In ground II, petitioner argues that prosecutorial misconduct during closing argument in misrepresenting the testimony of Tommy Hollifield deprived him of a fair trial in violation of his Fourteenth Amendment rights.   The Michigan Court of Appeals rejected this claim.[8]   Thus, deferential AEDPA standards apply.  *See* 28 U.S.C. § 2254(d).

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  This court does "not possess supervisory powers over state court trials." *Id.* "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (" '[T]he appropriate standard of review for ... a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' ") (quoting *Darden*, 477 U.S. at 181).  To be grounds for habeas corpus relief, the alleged misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181; *see Wogenstahl v. Mitchell*, 668 F.3d 307, 328 (6th Cir. 2012).  "'[T]he touchstone of due process analysis in cases of alleged

---

[8]In *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), the Sixth Circuit held that federal constitutional claims reviewed for plain error by a state court are claims adjudicated on the merits and are entitled to review under AEDPA standards.

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor,' because 'the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" *Beuke v. Houk*, 537 F.3d 618, 646 (6th Cir. 2008) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).   Even if the prosecutor's conduct was improper or "universally condemned," the habeas court can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair.  *See West v. Bell*, 550 F.3d 542, 565 (6th Cir. 2008).

Ruling. The first question for the habeas court is whether the prosecutor's statement was misconduct at all.  *West v. Bell*, 550 F.3d at 566.  If so, the court is to examine four factors in determining whether the impropriety was "flagrant": (1) the likelihood that the remarks would mislead the jury or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial.  *Id.*; *see Goff v. Bagley*, 601 F.3d 445, 480 (6th Cir. 2012).  A petitioner must do more than show erroneous conduct.  "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)).  Under AEDPA, this bar is heightened by the deference that the court must accord state-court rulings.  *See Bowling v. Parker*, 344 F.3d 487, 513 (6th Cir. 2003).

Here, the prosecutor's misstatement with regard to Hollifield's testimony appears to have been accidental rather than deliberate.  The prosecutor argued that Hollifield had testified that he sold a .25 caliber automatic handgun to Noel Duffing.  Hollifield's testimony was that he could not remember the type of gun he sold to Duffing.  Even assuming that the prosecutor's misstatement rose to the level of misconduct, it did not result in any prejudice to the defendant.  The prosecutor's

-42-

remark was isolated.  The jury was instructed that the prosecutor's argument was not evidence.

Further, Larry Owens and Sean Vida saw petitioner in possession of a .25 caliber, automatic

handgun.  Dawn Davis saw petitioner with two guns, a big, revolver-type "cop gun" and a smaller,

silver gun matching the description of the .25 observed by Owens and Vida.  The evidence against

petitioner was overwhelming.  The prosecutor's statement did not "so infect[] the trial with

unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

The decision of the Michigan Court of Appeals finding no due-process violation was not an

unreasonable application of clearly established Supreme Court precedent, nor an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).

### III.    Rights to Present a Defense and to Cross-examine Witnesses

In ground III, petitioner argues that two of the trial court's rulings violated his rights

to present a defense and to cross-examine witnesses.  (Pet. Brief at 29-33).  He argues that the court

"cut off" his cross-examination into Detective Rios's possible bias when it sustained the prosecutor's

objection to one of his questions.  (*Id.* at 30).  Further, he argues that he was "cut off" by the court

"when he was attempting to impeach Duffing with multiple prior statements to the police in which

he said that he did not know anything about Mr. Wheetley and a gun." (*Id.* at 29).

The Michigan Court of Appeals found that no constitutional violation had occurred

with regard to Duffing:

> Defendant next contends that he was deprived of his constitutional right to present a defense
> and cross-examine witnesses when he was not allowed to impeach Duffing with two prior
> inconsistent statements made to police.  We disagree.

(Op., 5).  The Court of Appeals did not address petitioner's constitutional claims regarding the Rios

cross-examination.  (*Id.*).  Further, the appellate analysis of petitioner's claims that he had been "cut-

off" during his cross-examination of Rios and Duffing was restricted to Michigan law.  (*Id.*).

Although the decision of the Michigan Court of Appeals on petitioner's constitutional claims based

on the cross-examination of Duffing is probably entitled to AEDPA deference, *see Harrington v.*

*Richter*, 131 S. Ct. 770, 784 (2011), all petitioner's ground III arguments will be considered *de*

*novo*.[9]

        The Sixth Amendment's Confrontation Clause states that in all criminal prosecutions,

the accused shall enjoy the right "to be confronted with the witnesses against him."  U.S. Const. Am.

VI.  The Confrontation Clause is applicable to the States through the Fourteenth Amendment's Due

Process Clause.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The Supreme Court's

"Confrontation Clause cases fall in two broad categories: cases involving the admission of out-of-

court statements and cases involving restrictions imposed by law or the trial court on the scope of

cross-examination."  *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (*per curiam*).  Petitioner's

challenges to the trial court's rulings fall within the latter category.  Cross-examination is a "primary

interest" secured by the Confrontation Clause.  *Douglas v. Alabama*, 380 U.S. 415, 418 (1965).

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-

examination, not cross-examination in whatever way, and to whatever extent, the defense might

wish."  *Fensterer*, 474 U.S. at 20.  Petitioner argues that the trial judge's ruling unfairly thwarted his

effort to cross-examine Detective Rios with regard to possible bias.  Potential witness bias is

generally an appropriate area of inquiry.  *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986);

---

    [9] *De novo* is a standard of review more favorable to petitioner.  Courts can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, *see* § 2254(a)."  *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2265 (2010).

*Davis v. Alaska*, 415 U.S. 308, 316 (1974).  "It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limitations on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at 679.

The Supreme Court has recognized a criminal defendant's right to present a defense.  "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).  This latitude, however, has limits.  "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'"  *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).  "While the Constitution thus prohibits exclusion of defense evidence under rules that serve no legitimate purpose or that they are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of issues, or potential  to mislead the jury."  *Holmes v. South Carolina*, 547 U.S. at 326.

-45-

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. at 308.

Petitioner conducted an extensive cross-examination of Detective Rios. (TT IV, 616-27, 630-35, 637-39, 641). The court sustained an objection to the following question:

Q      A lot of pressure was on you to get this case solved; isn't it?

MS. ROACH: Object.

THE COURT: Sustained.  Not an appropriate question.

(TT IV, 619). Petitioner did not seek any clarification of the trial court's ruling. He did not attempt to rephrase his question. He did not make a record of any additional questions he would have posed to Rios absent the court's ruling. Petitioner's arguments that he was prevented from establishing that Detective Rios had a motive "to cut corners on the question of identity" (Pet. Brief at 30) or "that he was cutting corners just to get a conviction" (*Id.* at 33) are utterly devoid of factual and legal support. I find that the trial court's ruling sustaining the objection to petitioner's ill-phrased question did not violate his rights under the Confrontation Clause or his right to present a defense.

Further, any error attributable to the trial court's ruling was harmless error.  Harmless error analysis applies in this context.  *See Van Arsdall*, 475 U.S. at 681-84.  As the Supreme Court has "stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Id.* at 681.  The *Brecht* standard is the harmless error standard applicable on habeas corpus review.  *See Fry v. Piller*, 551 U.S. 112, 121-22 (2007); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993).  Under the *Brecht* standard, "an error is harmless unless it 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Fry*, 551 U.S. at 116 (quoting *Brecht*, 507 U.S. at 631).  "In *Van Arsdall*, the Court mentioned a number of factors bearing on an

-46-

assessment of harmlessness, including the importance of the testimony foreclosed, whether it was cumulative, the extent of cross-examination otherwise permitted, 'and, of course, the overall strength of the prosecution's case.'" *Farley v. Bissonnette*, 544 F.3d 344, 348 (6th Cir. 2008) (quoting *Van Arsdall*, 475 U.S. at 684). The testimony from Detective Rios allegedly foreclosed was not as particularly significant. The testimony of Dawn Davis, Natasha Ivy, Erica Darknell, and Larry Owens, and the DNA and other physical evidence against petitioner were far more critical. Petitioner conducted an extensive cross-examination, and the evidence against him was overwhelming.

Petitioner's argument that the trial court "cut off" his cross-examination of Noel Duffing is likewise devoid of merit. Petitioner engaged in a lengthy cross-examination of Duffing. (TT III, 402-09, 410-13). Petitioner was able to elicit testimony from Duffing conceding that he had lied to the police when he told them that he had not sold a gun to petitioner. (TT III, 403-04). Petitioner was unsuccessful in his attempt to establish a foundation to have police reports admitted into evidence to refresh Duffing's recollection that he had lied to the police on two occasions. (TT III, 403-04; *see* Michigan Court of Appeals Op. at 5). The trial court advised petitioner that the police reports were "just hearsay." If police reports were considered reliable evidence, "they would be in front of the jury." (TT III, 404). The police reports were hearsay, and the statements attributed to Duffing within the reports were a second layer of hearsay. Rule 803(8) of the Michigan Rules of Evidence expressly excludes from the hearsay exception for public records and reports "matters observed by police officers and other law enforcement personnel." MICH. R. EVID. 803(8). Requiring petitioner to lay a proper foundation under the Michigan Rules of Evidence did not deprive petitioner of his right to present a defense. Petitioner's cross-examination established that

Duffing had lied to the police.  Evidence of a second lie to the police is largely cumulative.  Further, petitioner could have refreshed Duffing's memory in a manner allowed by Michigan law.[10]  *See* MICH. R. EVID. 612; *see also People v. Favors*, 328 N.W.2d 585, 590 (Mich. Ct. App.  1982). Alternatively, he could have shown that Duffing repeatedly denied selling a gun by questioning the police officers rather than attempting to have their reports admitted into evidence.

Upon *de novo* review, I find no violation of petitioner's rights to present a defense and to cross-examine witnesses, and that if any such violation had occurred, the error was harmless. *See Fleming v. Metrish*, 556 F.3d 520, 536 (6th Cir. 2009).

## IV.    Sufficiency of the Evidence

In ground IV, petitioner challenges the sufficiency of the evidence supporting his first-degree felony murder conviction.  (Pet. Brief at 34-41).  A section 2254 challenge to the sufficiency of evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*; *see Cavazos v. Smith*, 132 S. Ct. 2, 3-4 (2011) (*per curiam*) (*Jackson v. Virginia* "makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.").  Issues

---

[10]Rule 613 of the Michigan Rules of Evidence specifies the foundation that would have been required if petitioner had actually attempted to impeach Duffing with extrinsic evidence of a prior inconsistent statement.  *See* MICH. R. EVID. 613(b); *see also Barnett v. Hidalgo*, 732 N.W.2d 472, 480 (Mich. 2007).

of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins,*

506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence

supporting the conviction, in the light most favorable to the prosecution, with specific reference to

the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n. 16; *Davis v.*

*Lafler*, 658 F.3d 525, 531 (6th Cir. 2011).

   The Michigan Court of Appeals ruled directly on this claim.  Review of this issue

must be conducted under the AEDPA standard, which the Sixth Circuit has described as "very

deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the

sufficiency of evidence under the *Jackson v. Virginia* standard proceeds under the "unreasonable

application" prong of AEDPA.  *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008).  Such an

argument is properly understood as an allegation that the state court's decision resulted in an

unreasonable application of *Jackson v. Virginia*.  *See Eady v. Morgan*, 515 F.3d 587, 601-02 (6th

Cir. 2008). Review in such cases "is limited to determining whether the evidence was so

overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson*

*v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007).  This standard presents a "nearly insurmountable

hurdle" for the habeas petitioner.  *Davis v. Lafler*, 658 F.3d at 534.  "Adding to this extremely high

bar are the stringent and limiting standards of AEDPA." *Id.*

   The Sixth Circuit has summarized the "double layer of deference" given the

state-court decisions in the context of sufficiency-of-the-evidence claims:

> Thus, after AEDPA, federal courts reviewing state habeas claims accord a double layer of
> deference:
>
> > First, as in all sufficiency-of-the-evidence challenges, we must determine whether,
> > viewing the trial testimony and exhibits in the light most favorable to the prosecution,

*any rational trier of fact* could have found the essential elements of the crime beyond
a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61
L.Ed.2d 560 (1979). In doing so, we do not re-weigh the evidence, re-evaluate the
credibility of witnesses, or substitute our judgment for that of the jury. *See United
States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might
have not voted to convict a defendant had we participated in jury deliberations, we
must uphold the jury verdict if any rational trier of fact could have found the
defendant guilty after resolving all disputes in favor of the prosecution. Second, even
were we to conclude that a rational trier of fact could not have found a petitioner
guilty beyond a reasonable doubt, on habeas review, we must still defer to the state
appellate court's sufficiency determination as long as it is not unreasonable..

*White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th
Cir. 2009)).

In the present case, the Michigan Court of Appeals articulated the appropriate
standard under *Jackson v. Virginia*, citing state cases adopting this standard. (Op., 6). The Court
of Appeals found that the prosecution presented "overwhelming" evidence of petitioner's guilt. (*Id.*).
"In addition to the evidence regarding the victim's pants, evidence regarding defendant's own
incriminating statements, the tire tread analysis, the DNA analysis, and concerning the weapon used
to kill Afton all pointed to defendant's guilt." (*Id.* at 6-7).

The jury found petitioner guilty of first-degree felony murder. (TT V, 819). The
elements of first-degree felony murder are: (1) that the defendant killed a human being, (2) with
intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with
knowledge that death or great bodily harm was the probable result, (3) while committing, attempting
to commit, or assisting in the commission of any of the felonies enumerated in MICH. COMP. LAWS
§ 750.316(1)(b). *People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999); *see Matthews v.
Abramajtys*, 319 F.3d 780, 789 (6th Cir. 2003). The enumerated felony in this case was armed
robbery. *See People v. Akins*, 675 N.W.2d 863, 869 (Mich. Ct. App. 2003) ("[A]rmed robbery [] is

-50-

a well-established predicate felony under the felony-murder statute."). The jury found petitioner guilty of aiding and abetting the armed robbery. (TT V, 819). "To prove felony murder on an aiding and abetting theory, the prosecution must show that the defendant (1) performed acts or gave encouragement that assisted in the commission of the killing of a human being, (2) with intent to kill, to do great bodily harm, or create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of the predicate felony." *See People v. Riley*, 659 N.W.2d 611, 614 (Mich. 2003). "In order to satisfy the malice standard required under *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304 (1980), the prosecution must show that the aider and abettor either intended to kill, intended to cause great bodily harm, or wantonly and willfully disregarded the likelihood that the natural tendency of his behavior was to cause death or great bodily harm. Further, if an aider and abettor participates in a crime with knowledge of the principal's intent to kill or to cause great bodily harm, the aider and abettor is acting with 'wanton and willful disregard' sufficient to support a finding of malice." *People v. Riley*, 659 N.W.2d at 614. The facts and circumstances of the killing, including the use of a deadly weapon, may give rise to an inference of malice. *People v. Carines*, 597 N.W.2d at 136.

A rational fact-finder could easily find that the evidence presented was sufficient to meet each of these elements. Petitioner's DNA was found on a cigarette butt at the crime scene. The tread pattern from the car petitioner was driving matched those found at the scene. Witnesses observed petitioner in possession of two handguns before the killing. There was physical evidence from which a reasonable jury could have found that the victim had been savagely beaten, robbed at gunpoint, and killed. Dawn Davis's testimony certainly provides an adequate basis for the jury's

verdict.  It is reinforced by the testimony of numerous other witnesses.  The evidence against

petitioner was overwhelming.  I find that the decision of the Michigan Court of Appeals regarding

the sufficiency of the evidence supporting petitioner's first-degree felony murder conviction easily

withstands scrutiny under the double layers of deference to which it is entitled under AEDPA.

## V.    Alleged Violation of the Court's Discovery Order

In ground V, petitioner argues that the prosecutor committed misconduct and deprived

him of a fair trial by her failure to provide him with a copy of a page from Detective Miller's March

10, 2000 report.  (Pet. Brief at 42-50).  The trial court found no violation of its order.  The Michigan

Court of Appeals likewise found  "no evidence that the prosecution suppressed the page in issue."

(Op., 6).  Petitioner has not presented clear and convincing evidence to overcome this finding of fact.

28 U.S.C. § 2254(e)(1).  There is no evidence of any error or misconduct by the prosecutor.  At trial,

petitioner was provided with another copy of page 16 from Detective Miller's March 10, 2000 report.

After his receipt of this document, petitioner elected against asking Detective Miller any further

questions.  The Michigan Court of Appeals found no violation of petitioner's due-process rights.

I find that ground V does not provide a basis for granting petitioner's request for habeas corpus

relief.  28 U.S.C. § 2254(d).

## VI.   Self-Representation

In ground VI, petitioner argues that his Sixth Amendment rights were violated

because he never made an unequivocal request to represent himself and that he was never advised

of the pitfalls of self-representation.  (Pet. Brief at 51-60).  The trial court judge rejected this claim,

and his decision easily withstands scrutiny under AEDPA standards.  28 U.S.C. § 2254(d); *see Harrington v. Richter*, 131 S. Ct. at 784.

The Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance of counsel in his defense.  *See* U.S. CONST. amend. VI; *see also Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 154 (2000).  This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself.  *Faretta v. California*, 422 U.S. 806, 832-34 (1975); *see Indiana v. Edwards*, 554 U.S. 164, 170 (2008); *United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("The right to defend *pro se* and the right to counsel have been aptly described as 'two faces of the same coin,' in that waiver of one right constitutes a correlative assertion of the other." (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970))).

In *Faretta*, the Supreme Court observed that in most criminal prosecutions, self-representation would be an unwise choice, but personal liberties are not rooted in the law of averages:

> It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts.  But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly.  To force a lawyer on a defendant can only lead him to believe that the law contrives against him.  Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense.  Personal liberties are not rooted in the law of averages.  The right to defend is personal.  The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction.  It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage.  And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of that respect for the individual which is the lifeblood of the law.

*Faretta*, 422 U.S. at 834.

-53-

A defendant's waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent.  *See Faretta*, 422 U.S. at 835; *Johnson v. Zerbst*, 304 U.S. 458, 464-65 (1938).  For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' "  *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).  Whether a defendant's choice was made with 'eyes open' generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."  *Zerbst*, 304 U.S. at 464.

The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel."  *Iowa v. Tovar*, 541 U.S. 77, 88 (2004).  There is "no sacrosanct litany for warning defendants against waiving the right to counsel."  *United States v. Hodges*, 460 F.3d 646, 650 (5th Cir. 2006).  Under its supervisory powers, the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in the *Bench Book for United States District Judges* before accepting a waiver of a right to an attorney.  *See United States v. McDowell*, 814 F.2d 245, 249-50 (6th Cir. 1987).  The federal courts do not possess supervisory powers over Michigan's courts.  Further, this type of formal, detailed inquiry is not required by clearly established Supreme Court precedent.  *See Akins v. Easterling*, 648 F.3d 380, 398 n.9 (6th Cir. 2011); *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006).  Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel.  *King*, 433 F.3d at 492.  Rather, the state court must reasonably apply Supreme Court precedent,

-54-

which requires looking at the "whole matter" to determine if the defendant made a knowing and intelligent waiver. *Id.* "'[I]t is the [petitioner's] burden to prove that he did not competently and intelligently waive his right to the assistance of counsel.'" *Akins v. Easterling*, 648 F.3d at 395) (quoting *Iowa v. Tovar*, 541 U.S. at 92).

On this record there is no question that petitioner's waiver of his right to counsel was knowing, voluntary and intelligent.   Petitioner was not a stranger to the state and federal court systems.   He had felony convictions in both systems before his trial in this case began.   Judge Thomas instructed petitioner on the dangers and disadvantages of self-representation.   The transcript of the arraignment before Judge Thomas on July 2, 2002 (found in the Supreme Court record, docket # 30), shows a thorough colloquy between the court and petitioner on the issue of self-representation. Petitioner repeatedly insisted on representing himself.   I find that the trial court's decision rejecting this claim for lack of merit easily withstands review under deferential AEDPA standards. 28 U.S.C. § 2254(d).

## VII.    Refusal to Grant Funds for an Investigator

In ground VII, petitioner argues that the trial court's failure to provide him with an investigator violated his Fourteenth Amendment rights to due process and equal protection.[11] Judge Thomas held that petitioner's argument was "without merit," and his decision is entitled to deference.   28 U.S.C. § 2254(d); *see Harrington v. Richter*, 131 S. Ct. at 784.

In *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), the Supreme Court noted that a defendant's undeveloped assertions that the requested assistance of an investigator would be

---

[11]Petitioner also invokes Michigan's Constitution, but it cannot possibly provide a basis for federal habeas corpus relief.  *See* 28 U.S.C. § 2254(a).

-55-

beneficial falls short of establishing a deprivation of due process. The Supreme Court has never held that an indigent defendant supplied with appointed counsel is also entitled to the services of a private investigator at public expense. This is fatal to petitioner's habeas corpus claim. 28 U.S.C. § 2254(d)(1); *see Harris v. Stovall*, 212 F.3d 940, 945 (6th Cir. 2000); *accord Holbrooke v. Romanowski*, No. 07-10119, 2009 WL 1637014, at * 5 (E.D. Mich. June 10, 2009) ("Because there is no federal constitutional right to the assistance of an investigator, and because Petitioner has offered little more than undeveloped assertions that the required assistance would have been beneficial, his claim lacks merit.") (citation and internal quotations omitted). I find that the Newaygo County Circuit Court's decision rejecting this claim was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and did not "result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## VIII.   Leg Restraints

In ground VII, petitioner argues that the use of leg restraints on the first day of his December 2002 trial violated his rights under the Fourteenth Amendment's Due Process Clause. (Pet. Brief at 69-75). AEDPA deference applies to the trial court's decision rejecting this claim. 28 U.S.C. § 2254(d).

Petitioner relies on the Supreme Court's 2005 decision in *Deck v. Missouri*, 544 U.S. 622 (2005). In *Deck*, the Supreme Court addressed whether the routine use of shackles during the sentencing phase of a death penalty case violated the Due Process Clause. Before reaching that question, the Supreme Court for the first time expressly held that routine shackling of a defendant

during the guilt phase of a trial violates the Due Process Clause, "unless that use is justified by an essential state interest – such as the interest in courtroom security – specific to the defendant on trial." 544 U.S. at 624.  The Court stated that the law has "long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need." *Id.* at 626.  The Supreme Court reasoned that its prior statements "gave voice to a principle deeply embedded in the law:"

> We now conclude that those statements identify a basic element of the "due process of law" protected by the Federal Constitution.  Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.  Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at 629.

In *Lakin v. Stine*, 431 F.3d 959 (6th Cir. 2005), the Sixth Circuit concluded that "the principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided." *Id.* at 693.  The *Lakin* court specifically held that the constitutional rule was clearly established with respect to the habeas review of a decision that was final in 1994.  Thus, it was clearly established that the Due Process Clause forbade the visible use of shackles at petitioner's December 2002 trial unless the trial court made an individualized determination on the facts specific to petitioner's case that the use was justified by an essential state interest.  *See Lakin*, 431 F.3d at 963; *see also Mendoza v. Berghuis*, 544 F.3d 650, 653-54 (6th Cir. 2008).

The Supreme Court's *Deck* decision held that the Fourteenth Amendment "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.  Such a

determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial." 544 U.S. at 629. The record shows that a federal detainer had been lodged against petitioner and that it played a significant role in Judge Thomas's decision requiring that petitioner wear leg restraints. This falls short, however, of the specific findings envisioned by the Supreme Court's *Deck* decision. 544 U.S. at 629, 634-35. After observing petitioner's actions in the courtroom for a day, having received additional information regarding the detainer, and having satisfied himself that other security measures would prevent petitioner's escape, Judge Thomas allowed petitioner to appear for the remainder of his trial without the leg restraints. If the shackles were visible, however, their use for a day, absent the required findings, would be a due-process violation.

The record does not establish, however, that petitioner's leg restraints were visible. This is fatal to petitioner's claim. "*Deck*'s facts and holding [] concerned only *visible* restraints at trial. The Supreme Court was careful to repeat this limitation throughout its opinion." *Mendoza*, 544 F.3d at 654. "[T]he clearly established precedent on which [petitioner] relies – namely *Deck* – is limited to cases where the defendant's shackles are visible to the jury." *Mendoza*, 544 F.3d at 655.

Even if petitioner had shown that his shackling violated the Due Process Clause, any error was harmless. In *Deck*, a case proceeding before the Supreme Court on direct review, the Court held that a defendant need not demonstrate actual prejudice to make out a due-process violation. Instead, the State must demonstrate that the error was harmless, that is, "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' " 544 U.S. at 635 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Although

the Sixth Circuit subsequently applied the *Chapman* harmless-error standard to a habeas corpus case, *see Lakin*, 431 F.3d at 966, the Supreme Court has since made pellucid that, on habeas review, harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), not under the *Chapman* standard. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." 551 U.S. at 121-22 (citations omitted); *see Cook v. Smith*, No. 10-3182, 2012 WL 934033, at * 3 (6th Cir. Mar. 21, 2012); *Vasquez v. Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007); *see also Hatten v. Quarterman*, 570 F.3d 595, 604 (5th Cir. 2009); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008). Under *Brecht*, this court must consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638.

Upon review, I conclude that any constitutional error in shackling petitioner during the initial day of trial did not have a substantial and injurious effect on the jury's verdict. The evidence of petitioner's guilt was overwhelming. Accordingly, even if constitutional error had occurred, it was harmless. I find that the state court's decision rejecting petitioner's due-process claim based on the use of leg restraints withstands scrutiny under the deferential standards of 28 U.S.C. § 2254(d).

## IX.    Ineffective Assistance of Appellate Counsel

In ground IX, petitioner claims ineffective assistance of appellate counsel based on counsel's failure to raise the self-representation, hearing investigator, and leg restraints issues

petitioner raised in his motion for post-conviction relief.  (Pet. Brief at 76-80).  Claims of ineffective assistance of appellate counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  *See Evitts v. Lucey*, 469 U.S. 387 (1985). Petitioner must prove (1) that appellate counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687-88.  In adjudicating the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

Because the state circuit court found that petitioner's claim of ineffective assistance of appellate counsel was "meritless," its decision must be afforded deference under AEDPA.  *See Harrington v. Richter*, 131 S. Ct. at 784; *Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012).  To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*.  *See Bell v. Cone*, 535 U.S. 685, 698–99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner."  *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012).  This creates a "high burden" for petitioner.  *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Bourne*, 666 F.3d at 414.  "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Recent Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim

evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) (*per curiam*).

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id*. In the case of appellate counsel, petitioner has no constitutional right to have every nonfrivolous issue raised on appeal. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). Appellate counsel acts within the fair range of professional assistance when counsel chooses not to assert weak or unsupported issues on appeal. *See Smith v. Murray*, 477 U.S. 527, 536 (1986). Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel. *See United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). " 'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy." *Smith v. Murray*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. at 751-52). Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert. *Id.*; *see Bourne*, 666 F.3d at 411 (Petitioner "must show the issues his appellate counsel failed to raise were 'clearly stronger' than the issues his counsel did raise – and that the state court lacked a reasonable basis for believing otherwise."). The meritless issues petitioner raised in his motion for

post-conviction relief were not clearly stronger than the issues his appellate counsel raised. Appellate counsel has no duty to raise meritless issues. *Evitts*, 469 U.S. at 394; *Lewis v. Alexander*, 11 F.3d 1349, 1354 (6th Cir. 1993).

As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Consequently, counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). Petitioner does not approach satisfying this demanding standard. I find that the state-court decision rejecting petitioner's claims of ineffective assistance of appellate counsel was not an unreasonable application of clearly established federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d)(1).

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:  May 9, 2012             /s/  Joseph G. Scoville
                                United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). General

objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).